The next argument is in Pam S.P.A. v. United States, Appeal 1066. The next argument is in Pam S.P.A. v. United States, Appeal 1066. Mr. Simon, good morning. Good morning. Welcome to the court. Please proceed. Thank you very much. My name is David Simon. I represent the appellant Pam S.P.A. in this appeal to the Court of International Trade. Is your position that the percentage was unreasonably high, disproportionate, or something of that sort? Or is your position that the Commerce Department had to use the average of all the sales for the period in question? No, Your Honor, our position is that the Commerce Department should have given us access to, if I may back up, our review involved the sixth period of review. Commerce brought into the record the transaction margin data set, the U.S. sales, from the fourth POR. Our position is that Commerce should have brought into the record, in addition, the home market sales and the cost databases from the fourth POR to give us an opportunity to determine whether that little subset of sales with high margins were normal in quantity, value, and type. Weren't you asked questions time and time again, and then the answers weren't given? Pam, you've got extensions to file, and then when this comes up, finally you say, oh, gee, now we're going to give the information, but we don't want to give it when you first asked the first couple of times. And then the excuse seems to be, well, we weren't quite aware of that, or whoever was doing it wasn't aware of that, or something like that. Your Honor, that's not exactly the situation. Pam gave all the questionnaire responses. When it came to verification, it turned out that the home market sales database did not reconcile with the accounting records. Information wasn't provided. The questions weren't answered properly. Okay, that's right. And we don't deny that, and Pam acknowledges that it should have adverse facts available. That's clear. We have not denied that. The question is, what should be the level of the duties imposed? And the Commerce Department selected a margin, 45.49 percent, from historical sources. And the CIT sent the case back and said, if you want to use this margin, you have to corroborate it. And the corroboration that Commerce used consisted of the fourth review, two reviews earlier, the fourth review transaction margin data set, in which there were something like 17 or something like that, sales that were at or above 45.49 percent. Commerce said... How far apart in time are these reviews? Two years. It's okay. We're not complaining that they shouldn't have used the fourth review. What we're saying is, if you're going to use the data from a prior review for corroboration, you have to give us an opportunity to confront that data.  Because in Ta-Cheng, the data were acknowledged to consist of sales that were normal in quantity, normal in value, and normal in type. And also in Mittal Steel, which is the other case that is floating around, the CIT case, in that case Commerce did exactly the same thing, but they brought into the record the normal value databases. They enabled the respondent, in exactly the same situation, to analyze whether those sales should have been used. When you say you had to be given an opportunity to produce additional data, I'm not quite sure what you mean. Were you denied? You said, here's some data we want to submit, and they said, oh no, we won't hear it. No, Your Honor. What do you mean by opportunity? It's not our data. The Commerce Department did the POR4, the fourth review, fourth period of review. Those data live in the Commerce Department's archives. They went to their archives and they brought into this record the fourth review transaction margin data set, which does not include home market sales, and it doesn't include cost. Those are invisible. They're not there. And we said to Commerce, when you went to your archives and got U.S. sales, you should have picked up also home market sales and cost, just as you did in Mittal, and just as happened in Ta-Cheng. But aren't we getting into the fact they're using these outliers, this adverse inference, mainly because questions weren't answered the first time, and doesn't the court have a Rule 11, similar to Federal Rules of Procedure 11, which says that whoever signed those documents and those answers to them verified or certified that they had done it after sufficient research. A lawyer can't sign something and later on say, oh, I forgot about those other sales to the charity or those gifts to the charity, and I forgot about those government sales because I thought maybe they weren't there. The lawyer signing it under Rule 11 is expected to have done that research, know the law, and have talked. Now, sometimes your client doesn't tell you stuff. That happened to me. But at the same time, I mean, Commerce sends in a couple of different questionnaires, and then you come back and say, well, we didn't answer the first time, but now we want to answer. Never did that happen. That's not our situation. Look, we answered the questionnaires in a flawed manner. We deserve adverse facts available. I don't deny that. The question is, and Commerce can pick a number as AFA, adverse facts available. They can do that, but the law requires that that number be corroborated. What does it mean, corroborated? You have to find evidence that that number is reasonably applicable to the respondent. And that's why they picked the fourth review. But isn't that under the substantial evidence test? In other words, that corroboration at this point is under substantial evidence, not under preponderance? Sure. Okay. So, in order to see if the margin was corroborable, they brought into the sixth review record a piece of the fourth review record. Containing a lot of results that were higher than this number. That's right. And we say, let me back up. In Ta-Cheng, which is the controlling authority, everything happened within the context of the same review. Ta-Cheng failed to do something in that review, and so they looked in the databases of that review to decide what corroboration existed. So, Ta-Cheng could look at its U.S. sales, its home market sales, its cost of production, everything else in that record. They had the ability to confront all of the databases and say, these databases are good or these databases are not good. The sales are somehow not representative because, for whatever reason. And Ta-Cheng agreed that the sale selected as corroboration was a normal sale at a normal price. It was normal. Normal quantity, normal value, normal product. What did the Chief Judge just ask you about? Was there anything that you were not allowed to tell the fact finder? Your Honor, it's not what we were allowed to tell. We cannot put into the POR6 record the POR4 results. We don't have that, right? You can explain why the POR4 results might be a little skewed or why they shouldn't be used. We can't if they're not in the record. That's the problem. If the POR, look, dumping compares U.S. price to home market price, okay? Excluding the home market prices that are below cost. The hyper margins, the margins above 5.49% were, 95% of them were a particular kind of product sold to the U.S. The problem was not that the U.S. sales were anomalous. There was something demonstrably weird about the normal value. But we can't put our finger on it if commerce refuses to put the home market database from POR4 in the record. But didn't you put your finger on it when you said that those were skewed because it was in one case charity and one case... No, your honor, those ones, the J.S. sales to the charity and the sales from the external warehouse, those are POR6 data. We can forget about that. Commerce threw out our databases completely. They're not relevant anymore. In their place, they took the POR4 database, U.S. sales database, and they found margins there that corroborated the 45%. It's no longer a question of what happened in our six review databases. We were bad. We failed to give the data. Okay, we acknowledge it. And what commerce did was they selected the POR4 U.S. sale database, more specifically the transaction margin data set, which is not the full database. And they said, we see margins in here that corroborate the 45.49. And I say, I can tell because that transaction margin data set includes the normal value. I can tell that these normal values are bizarre. Nobody pays $2,000 a ton for pasta that costs $600 a ton to produce. I can see that they're bizarre. If you will put it in the home market sales database as you did, as Ta-Cheng could see it, and Mittal Steele could see it, if you would do that for us, then we can have a reasonable conversation about whether these sales are normal or not. They just declined, flat out declined. They said, you've got a half a percent worth of your sales are over 45.49%. Those represent real sales, and we have nothing further to talk about. So your point then is that the sales from the fourth period of review that they rely on were aberrational, unrepresentative. And that if they had relied on representative sales, the percentage would have been far lower. I don't know what the percentage would have been. I'm not saying that the U.S. sales per se were aberrational. I am saying that the margins were aberrational because the normal value was aberrational. But they didn't give me the ability to test the normal value because they wouldn't put the database in the record, as they did in Mittal. If Ta-Cheng could see it. You don't have it yourself. No. And I couldn't put it in the record if I did. All right. Let's hear from the government, and you have three minutes for rebuttal. Thank you. Ms. Staley. I beg your pardon. Ms. Dempsey is, I'm told, to speak first. May it please the Court. Commerce reasonably exercised its discretion when it used a corroboration methodology that was expressly upheld by this Court in Ta-Cheng. In Ta-Cheng, this Court held that transaction-specific margins of a respondent was based upon actual sales and thus may be used for corroboration purposes. But once you get to there, what about his claim that you're using information, you're not giving him a chance to explain it to you? I didn't read that in the record, but what actually happened? I mean, did they go back, and I think under Rule 11 you're allowed to do that, and he's admitted the adverse inference is allowed. But in a system of fairness, shouldn't you give him a chance to explain? Well, what we did was Commerce put all of Pam's transaction-specific margins from the fourth period of review on the record. That's sufficient. Commerce is not required to put the underlying cost database or any other further data on the record. It was sufficient that they had transaction-specific margins based on Pam's actual sales data. And therefore, what we're comparing, what we're corroborating, the selected adverse facts available rate was with Pam's transaction-specific margins, which was a methodology that was expressly upheld by this Court in Ta-Cheng. Let me ask you a question. Maybe I just don't understand what's happening here at all. Suppose there are 1,000 sales from a prior review period, and I'm the importer. I'm the one who's dumping the product. So in a prior review period, I get slapped with duties based on a certain dumping margin. So there are 1,000 sales. One sale, the dumping margin is 99%, and in all the other sales, the dumping margin is 1%. Is Commerce allowed to take the 99% dumping margin and say, that's what we're going to use as adverse facts available, even though it's only one of 1,000 sales, and we're allowed to ignore the other 999 sales where the margin was only 1%? Well, Commerce looks at a Commerce examiner. It's a yes or no question. Is Commerce permitted to do that? Well, it depends on you're saying that one sale is 99% and the others were 1%. Well, that would be certainly considered by Commerce to be more aberrational than the circumstances here. That's not the question. I'm trying to understand the logic of your position. So I'm giving an extreme example. 1,000 sales, one has a very high dumping margin. The other 999 have very low dumping margins. Can Commerce take to use against the importer the one high margin sale and ignore the large number of other low margin sales? Well, Commerce would have to look at the underlying, whether that one sale that had a 99% margin was outside the ordinary course of business or whether it was transacted in a normal manner or not. Commerce looks at a number of factors in determining. Would it make a difference if that one sale was, say, two-thirds their total volume that year and the other 999 were merely one-third? That might make it a more important sale? That's correct. It certainly establishes that. It may not just be purely the number. It may actually be how important that sale is. I don't know what you all look at. That's what we're trying to find out. Well, Commerce looks at the reliability and relevancy of the corroboration data. In this case, Commerce... Wait a minute. I don't think we have a response yet to either Judge Clark's question or mine. Assume that a high margin sale or portion of sales is completely reliable. It's accurate. For those sales, that percentage was exactly right, and you verified that it was right. But there were a whole lot of other sales at a much lower margin. Can you ignore the latter group? Yes. So you could pick the highest number in order to maximize the punishment or disincentive for future non-cooperators without any limitation at all? Well, that's the limitation. You're using one of the respondent's actual sales. Who is to tell that during this period of review that because PAM failed to cooperate, we have no idea? They didn't submit. We have no idea what the normal value of the home market sale is. Therefore, they didn't report two-thirds of its home market sales. We have no idea what type of dumping margin would have been assigned during this period of review because they failed to cooperate. Okay. You're saying your answer to the Chief Judge is hypothetical, is there not enough information, and you've got to look at more than just one sale versus $999? In touch. Okay. Let's focus on the question. Hypothetical is important. Yes, Your Honor. Is what you're saying that the information on the one sale versus $999 sales is not enough information, that you might need to know whether or not the other side had given you other information? You might need to know how big was that one sale in terms of total percentages. You might need other information. Is that what you're telling us, or are you actually saying that one sale is always enough? That is what this court held in Ta-Cheng. That one sale that represented 0.04% of Ta-Cheng's entire sales database was sufficient. In this case, we have several transaction-specific margins, over 30 transaction-specific margins that were higher than PAM's selected adverse facts available rate. Additionally, there were several transaction-specific margins that were slightly below but within 10% of the selected margin. The adverse facts available rate that Commerce selected was clearly within the range. It was several times below the highest transaction-specific margins and was clearly within the range of PAM's actual sales data and was adequately corroborated in this case. Well, doesn't what Ta-Cheng really say is that Commerce will be upheld unless it's unsupported by substantial evidence? Well, that is the standard of review that Commerce uses. So you're saying that one sale out of 1,000 is always substantial evidence? We're looking at substantial evidence supporting Commerce's corroboration of a selected adverse facts available rate. And in this case, there is a reasonable basis for Commerce to have exercised its discretion in selecting its adverse facts available rate. I still don't think I understand how you're reading Ta-Cheng. Are you saying that if 0.04% of the sales are at a high margin, you can use that margin because you have that quantity of sales, 0.04%? Yes, Your Honor. You think that's the holding of Ta-Cheng? The holding of Ta-Cheng, yes, that's partially what this Court held. This Court held that an adverse fact… So you think that any time that the margin you want to rely on correlates to 0.04% of the sales, it's valid and untouchable on review? Well, not precisely 0.04%, but what it establishes… Or more. That's a magic number. If we have as much as 0.04% sales data, we always win. I don't think that's the magic number. What I think this Court… What is? What is the magic number? There is no magic number. We're saying that this Court held that one sale that actually is representative of… 0.04 was adequate. 0.5 certainly is. That's correct, Your Honor. But what happened in Ta-Cheng was the corroboration was based upon one sale that happened to represent 0.04% of the database. In this case, it's 0.5%, which is several times higher than the sale in Ta-Cheng. Using more sales. Yes, Your Honor. It's not only higher, but it's more reliable data. Yes, Your Honor. All right. Let's hear a rebuttal from Mr. Simon. Oh, I'm sorry. Ms. Dempsey. I beg your pardon. No, I still got it backwards. Ms. Staley. Sorry. Thank you, Your Honor. I just wanted to fill in a little bit of the… to follow up on along with what Ms. Dempsey had said. What we're talking about is the use of valid margins. If Pam had believed that those fourth review margins were for some reason outside the ordinary course of trade, or if they were not valid, it could have appealed those fourth review results. The truth is that those margins… When? After the fourth review results had been issued, Pam could have appealed those results at that time. But they didn't know they would be used in the sixth review later on. Did they have a chance to appeal at the sixth review the use of the fourth review results? No, Your Honor. But they had the opportunity at that time to challenge the validity of those margins. That time being which time? After the end of the fourth review. Well, of course. You're saying that collaterally has stopped in essence now. Yes, yes. Because now they're trying to argue that these things are wrong or outside of the ordinary course of trade. If they truly believe that those margins were not valid, then they should have appealed it at that time. Isn't the purpose of the court's opinion saying there must be corroboration is to make sure the government just doesn't run hog wild over people every time they get a chance? There's got to be some… I mean, this is the government. We've got to be a little bit fair. I mean, isn't that kind of what the purpose… I mean, there's got to be corroboration. You just don't get to win just because you're big. You still have to show some fairness, kind of like a prosecutor has to seek justice. A defense lawyer has to try to protect his client. Isn't there a little bit of that in these cases so there has to be some showing of corroboration? Yes, Your Honor. There has to be some sort of corroboration, but it has to also take into the fact that in the prior reviews, perhaps their normal values were more in line with what their normal values would have been in this case. And so the reason they don't submit data is because they think that they're going to get lower margins. They had those actual margins in the fourth review. They were based on actual sales, and they were based on actual comparisons of U.S. sales to actual normal values. The Commerce Department cannot just pull a number out of the air or say a triple margin or double percent margin, something along those lines. It has to be based on an actual sale, and that's what they did. But it only needs one sale? Your Honor, if it was one sale that was an actual sale during the time, it was never challenged by the respondent as a valid sale. Well, we already know it wasn't challenged, so we don't have to keep going back over that. Well, then yes, it could be based on one sale, Your Honor. No matter how many other sales, that other margin that there were. Yes, Your Honor, because it could be that that one sale is representative of the actual dumping that would have been taking place in the sixth review, in the prior review. Well, are you asking us then to assume that the reason that they didn't cooperate in the sixth review period is that they knew that the margins would be even higher, and therefore they were hoping that they could get the lower margin from some prior review period when Commerce had to use the alternative method? Well, yes, Your Honor. I mean, that is what we normally expect, is that the reason they're not... But what if I make pasta and I can't comply with the questionnaire because the records got lost? Well, Your Honor, Nippon Steel, the court made very clear that the intent of why someone may not provide information is not really relevant. It's just whether they cooperate or not. Well, I'm just trying to test your assumption that the reason I'm not cooperating in the current review period is because I know the margins will be even higher than in any prior review period, and so I'm trying to get the benefit of the earlier margins because I know the true margins now would be even higher, and that's the whole reason I don't cooperate. And I'm just saying, well, there might be other reasons somebody is not cooperating.  You're right, Your Honor. In Nippon Steel, this court said that the intent or the reason why someone was not cooperating wasn't really the factor about why you go adverse facts available. The reason, as long as, if the respondent doesn't cooperate to the best of its ability, either because they've lost records or because they're trying to angle for a higher margin, Well, they want a lower margin, don't they? They're trying to angle for a lower margin, the respondent, right. And so the reason that they cooperate or don't cooperate isn't that important in terms of deciding whether you're going to go adverse facts available. So that's that first step of the adverse facts. Well, you have no choice, right? If they can't give you the data for which you can make actual calculations, then you have to use adverse effects because there's no other alternative. Yes, Your Honor, that's right. So the question isn't whether Commerce gets to use this safety net provision. The only question is, are they doing it in some wildly disproportionate fashion? Yes, that's true. But if it's an actual margin that's been calculated, then it is reasonable to assume that that dumping could have taken place in the subsequent review period. Let me rephrase the question. In this case, your co-counsel said there had been many, many sales and plenty of evidence and so forth. But the hypothetical was one out of 1,000, perhaps one insignificant little tiny sale of one box of pasta out of 1,000 sales or 999 sales, which involved tons. Yes, Your Honor. Surely you're not saying that's going to be enough under the substantial evidence rule. I mean... One sale because that one box could reflect the dumping margin in the subsequent period. The volume of sales actually really has nothing to do with the dumping margin. You could have a million boxes of pasta and you could have been dumping them at a 50% rate. But if you're going to allow speculation, then why don't we let Commerce impose a rate of 1,000%? Because it could be that in the period of review where they didn't cooperate, the margin would have been 1,000%. So let's let Commerce have unlimited percentage, any percentage they want. But the statute says that they need to corroborate it. What does it mean? Well, Your Honor, that is a good question. But the way that this has been interpreted by the Commerce Department in its discretion is to look at dumping by that respondent in prior periods. And the fact that this... Let me change my hypothetical and make it a little simpler and incorporate Judge Clark's very thoughtful point. Suppose there are 100 sales of equal quantity in a period of review. Commerce assesses all the data. I'm the importer. And they say for sale number one of these 100 equal sales, we're slapping you with a 50% margin. For all the other sales, we're slapping you with a 1% margin. Now later, I don't cooperate in some period of review. If I understand you correctly, you're saying Commerce can go back and cherry pick the one 50% sale and ignore the other 99 very low percentage sales because it could be that in the period where I didn't cooperate, I'm actually dumping at a level of 50%. Yes, Your Honor. So there's no limit. As long as there's one sale in the past, they can be socked with that no matter what. Yes, Your Honor, because that is evidence. If that's an actual sale made in the ordinary... Yeah, but the other sales were also actual sales and they only had a 1% margin. There were 99 1% sales. There was one 50% sale. And you're saying Commerce can ignore all the very much larger number of 1% sales and take the highest single sale. As long as it is 0.04% of the total or more. But, Your Honor, let's consider the alternatives. But you are saying that. What? You are saying that. Yes, Your Honor, because of the lack of other alternatives. No, the alternative is you average it. You take the 50% sale and then the other 99 that are at 1% and you work out an average and you slap them with that. But, Your Honor, the average, the margin from that period where you're saying the 100 and the 99 to 1 sale, the margin that was calculated in that review is a weighted average. But isn't the alternative also to do what every other court in the country does is substantial evidence and say, okay, there's some evidence here more than one tiny little thing, more than a scintilla, and that's what I'm going to go with. Isn't that the other alternative the department could use? And then the finder of fact would say, well, more than a scintilla, more than one box of spaghetti was involved here, tons were involved, or two sales, or as your co-counsel said in this particular case, many sales. But you're saying, I mean, the concern here is the department seems to be wanting it all. No, no. Far beyond this case. I completely disagree, Your Honor, because when you're talking about the scintilla of evidence, we're talking about how you calculate a dumping margin. And it has to do with the comparison of the U.S. price and the home market price. And, yes, there might have been one sale, but that doesn't make that. You have to be arguing that that sale, that particular sale, was not valid. It was a valid calculation. No, we're admitting in the hypothetical that all the calculations are valid. But the question is whether you get to cherry pick one out of 100 and ignore the other 99. Well, for one thing, in this case, Your Honor, they picked a margin that was based on an earlier. The margin that we're talking about is not based on the 17 sales. I know you understand that there was a much higher number, a much higher margin than the 45 percent. So all that they were using those 17 or whatever sales for was to corroborate the 45 percent margin. So they didn't cherry pick just the highest number. They didn't pick the highest dumping margin. They didn't base the 45 percent on those 17 sales. Yeah, but you're saying they could have, and it would have been okay. Yes, Your Honor, they could have. Well, that's the part that concerns us. Your point is that this isn't the case where there's just one item. Well, you're right, Your Honor. This isn't that one case. And it would have to have shown that they abused their discretion in picking some kind of aberrational sale that was found to be outside the ordinary course of trade. That isn't what happened here. Even if one is only a scintilla, you have a lot more than one here. Yes, Your Honor, there certainly are more than one. And also, just to remember that the 45 percent wasn't based on the sales. The 45 percent dumping margin that was used was not based on the sales that took place in the fourth period. They were just used to corroborate the rate of the 45 percent sales. Say that again? The 45 percent rate that was used as adverse facts available was not based on the dumping margins that occurred in the fourth review period. The fourth review period rates were only used to corroborate the validity of the 45 percent. Well, then where did the 45 percent come from? It came from a prior review period based on... Other than the fourth? Yes, Your Honor. Which one? It was based on a rate for another foreign producer, Borilla. That's right. Okay. You're right. So, I mean, just to keep in mind that we're... You know, this is a whole picture here and not just... They aren't... I mean, my personal view is that Commerce could pick one margin. But that's not what happened here in any event. And it was only to corroborate the 45 percent margin that had been applied calculated for another respondent. All right, fine. Thank you. Mr. Simon, you have just a few minutes for rebuttal. Three. Your Honor, thank you very much. A couple of points. Commerce selected 28 sales. Those were the ones with margins that are above 45.49 percent in the POR4 database. There were over 3,000 U.S. sales. So you're talking about one out of a thousand, basically. One sale is enough under the rule of Tochen. One sale is enough, no matter if it's one out of a thousand or one out of a million. But in Tochen, the respondent had the opportunity to say whether that sale was normal in quantity, value, and type. Yeah, you mentioned that in your opening argument because it was all on the same review period, so all the data was on the table. Okay. And in Mittal Steel, where Commerce brought in data from a previous review, they brought in the normal value database. So Mittal could point to it, if it wanted to, and say the normal value is bizarre. Okay? That's what they didn't let us do. And that's why we think there should be a remand. We'll, if the Court wants to overrule Tochen. What about the argument that you had the opportunity to contest anything done in the fourth review at that time, and having not taken it, now it's too late to reopen it all? Well, frankly, the collateral estoppel issue in administrative proceedings has not been briefed by either of the parties to any extent. Government counsel made that point without any authority. And my position would simply be that in the fourth review, it was a nothing issue because, Pam, because those were such outliers in the fourth review that they had no material impact on the margin. So why go to court? But when they become the basis for a decision, rather than just an outlier in a 20,000 row database, then you're talking about a different kettle of fish. Your Honor, that's all I have to say in rebuttal. If there are any questions, I'm not going to take them. We thank all three counsel. We'll take the appeal under advisement.